COMMONWEALTH *vs.* JOSEPH SLEEPER

Hampden. November 9, 2001. - January 10, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Argument by prosecutor, Instructions to jury, Reasonable doubt, Presumption of innocence, Voluntariness of statement, Assistance of counsel, Capital case. *Constitutional Law,* Jury, Assistance of counsel. *Evidence,* State of mind, Spontaneous utterance, Relevancy and materiality, Authentication, Cross-examination, Impeachment of credibility, Opinion, Consciousness of guilt, Exculpatory. *Homicide. Insanity.*

At a criminal trial in which a juror indicated that he was a friend of a Commonwealth witness, but in response to questioning from the judge indicated that he could remain impartial, there was no error causing a substantial likelihood of a miscarriage of justice in the judge's finding of juror impartiality absent a clear showing of an abuse of discretion or that the finding was clearly erroneous. [587-588]

At a criminal trial in which a juror was seen in a court house elevator with relatives of the victim, there was no error in the judge's crediting the juror's response that the case was not discussed. [588]

At a criminal trial in which the judge conducted a hearing at sidebar without the presence of the defendant and excused a juror without objection, the judge's discharge of the juror was, in the circumstances, harmless beyond a reasonable doubt. [588-590]

At a murder trial in which the judge admitted evidence on three occasions of the victim's expressions of fear after she received telephone calls from the defendant, the evidence was properly admitted as a spontaneous utterance and, although it was evidence of the victim's state of mind, it was relevant to the defendant's intent and motive. [590]

At a murder trial in which evidence was admitted over objection that the defendant telephoned a friend of the victim the day after the victim had been killed, circumstances authenticated the defendant as the caller, although the friend could not authenticate the voice of the caller as that of the defendant. [590-591]

At a murder trial in which the prosecutor, on six occasions, impeached the defendant with evidence of prior bad acts, there was no showing that the judge abused his discretion with respect to the scope of cross-examination allowed the prosecutor on the occasions that the prosecutor was merely revisiting material that had been elicited during the defendant's direct examination and there had been no objection; nor was there error on the other occasions when the defendant was impeached, over objection, with evidence of his debt and about his reason for leaving his job, where the

scope of cross-examination was properly contained and the prosecutor did not make unfair use of the evidence. [591-593]

At a murder trial, there was no requirement that a certain prosecution expert witness express an opinion on "diminished capacity" before giving testimony, over objection, that, at the time of the crime, the defendant was capable of conforming his conduct to the requirements of the law, could premeditate, harbor malice, and distinguish right from wrong — issues that were relevant to the case. [593]

At a murder trial, the prosecutor did not violate the rule of *Doyle* v. *Ohio*, 426 U.S. 610, 617-619 (1976), by soliciting testimony that a State trooper who interrogated the defendant did not obtain a written statement because the defendant invoked his right to counsel, or by making improper comment during closing argument on the defendant's exercise of his right to silence or to counsel. [593-594]

At a murder trial, the prosecutor's request that the jury consider the defendant's interest in the case as a motive for testifying as he did was not improper. [594-595]

At a murder trial, the prosecutor's references to the defendant's lies were not unfair comment, where the references had firm basis in the evidence and were not an expression of personal belief; further, additional comments by the prosecutor constituted fair comment based on the evidence. [595-596]

At a murder trial, the judge's instructing the jury on the elements of murder in the second degree before defining murder in the first degree, without directing the order of the jury's determination of the degrees of murder, was not error. [596-597]

At a murder trial, the judge's instructions to the jury on premeditation comported with *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994), and *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905), and there was no error. [597]

There was no merit to the defendant's claim that the jury at his trial for murder was erroneously instructed that the Commonwealth need only prove that he was *capable* of forming the specific intent to kill, rather than proving that he actually formed the specific intent to kill. [597-598]

At a murder trial, the judge correctly instructed the jury that, in order to obtain a conviction of murder, the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion or adequate provocation. [598]

At a murder trial, there was no error in the judge's instructions to the jury on consciousness of guilt as it related to the defendant's disposal of the knife he used to kill his wife, where the evidence was relevant to the question of the defendant's identity as the killer. [598-599]

At a murder trial, the judge did not err in his instructions to the jury on reasonable doubt and the presumption of innocence. [599-600]

At a murder trial, the judge did not err in refusing to give a requested insanity instruction, where the evidence was insufficient to warrant an instruction on insanity. [601]

At a murder trial, the defendant was not entitled to a "humane practice" instruction, where the voluntariness of a confession or admission was not made a live issue at trial. [601-602]

At a murder trial, defense counsel was not ineffective in his opening statement, as alleged by the defendant, because of a "promise" he made that

the defendant would present an insanity defense, even though he knew that no evidence would be produced to support that defense, where it was apparent from defense counsel's preparedness and consistency in strategy that any reference to insanity in his opening was never meant to suggest the promise of an insanity defense, and no reasonable juror would feel "disappointed" by the defense. [602-604]

At a murder trial, defense counsel was not ineffective due to the many assignments of error presented in this appeal, which were merely duplicative of claims of error that did not create a substantial likelihood of a miscarriage of justice. [604]

On a motion for a new trial in which the testimony of an expert witness for the Commonwealth was questioned, the judge's conclusion that the prosecutor had not violated the duty to disclose exculpatory evidence pertaining to the expert witness was not clearly erroneous; further, the judge did not abuse his discretion in concluding that certain impeachment evidence regarding the expert was not admissible; finally, even if it could be said that a claim that the professional credentials of the expert witness had been misrepresented, such a claim did not warrant a new trial. [604-607]

INDICTMENT found and returned in the Superior Court Department on September 17, 1993.

The case was tried before *John F. Moriarty*, J., and a motion for a new trial, filed on May 19, 1997, was heard by *Judd J. Carhart*, J.

*William C. Newman* for the defendant.

*Thomas H. Townsend*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant appeals from his conviction of murder in the first degree on a theory of deliberate premeditation,[1] and the denial of his motion for a new trial.[2] On appeal, he makes twenty-nine assignments of error[3] and requests relief under G. L. c. 278, § 33E. We affirm the conviction.

1. *Background.* The underlying facts that led to the killing of

[1]The defendant also was convicted of violation of a domestic abuse protective order. That indictment was placed on file and no issue relating to that motion has been raised on appeal.

[2]The trial judge retired before the motion for a new trial was filed. The motion for a new trial was heard by a different judge.

[3]Because of the connection between many issues resurrected by the motion judge and the issues on direct appeal, we have combined them by category, indicating those that have been resurrected. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998).

Victoria Sleeper, the defendant's estranged wife, are largely uncontested. The defendant and his wife were married in June, 1972. The couple had two sons. Discord led them to separate in March, 1992, and Victoria obtained a protective order under G. L. c. 209A, § 3, the following September. The order directed the defendant to surrender his keys to the couple's marital home in Springfield, that he not go to the marital home, and that he not telephone Victoria at her place of employment. Notwithstanding the court order, the defendant frequently telephoned Victoria at work, and he would enter her home when she was not there. She filed an action for divorce in October, 1992, and obtained extensions of the protective order on September 22, 1992, and August 5, 1993. The defendant filed a separate action for divorce in which he alleged an irretrievable breakdown of the marriage. The couple's two sons had attained the age of eighteen years and were living with Victoria at the time of her death.

In August, 1993, Victoria began dating a member of the health club where she worked. The defendant continued to telephone her at work, and he telephoned her at home, as well. He made threatening telephone calls to the man she dated. On Thursday, September 2, 1993, Victoria and her male friend went to the New Jersey shore for the Labor Day weekend. At about 2 A.M. on Friday, September 3, the defendant walked into Victoria's house and asked his younger son where Victoria was. His son told him it was none of his business. The defendant made numerous telephone calls over the weekend to determine her whereabouts. He telephoned her place of employment and her male friend's place of employment, in each instance fabricating a family emergency as a pretext to locate her. He also entered her home in search of information that might reveal her whereabouts. He telephoned his younger son, again trying to find out where she had gone. During the course of the conversation the son asked him repeatedly if he had been in the house. Eventually the defendant admitted being there, and asked his son not to tell Victoria. When Victoria returned during the late afternoon of Monday, September 6, she learned from neighbors that the defendant had been in her home. She reported the incident to the Springfield police, who interviewed her at her home at about 8:10 P.M. that evening.

Sometime before 9 P.M. on September 6, 1993, the defendant drove to a gasoline station near Victoria's home, parked the car that he borrowed from one of his sons, then walked to Victoria's home to confront her about her male friend. An argument ensued and Victoria went upstairs to telephone the police. He tried to prevent her from making the telephone call, and stabbed her with a knife he took from a toolbox in the house. He noticed she was still breathing, but he did not telephone for an ambulance.

He left the home at about 9:30 P.M., driving away in Victoria's car. He went to his own apartment, and later left some personal belongings on a porch at the home of a friend. He also left an envelope containing bank statements, the check belonging to Victoria, and a personal note to his sons. At about 1:50 A.M. on September 7, he telephoned Victoria's male friend and, in a calm voice, told him he was going to pay and that his judgment day was near. Ten minutes later the defendant walked into the State police barracks in Springfield and told the trooper at the front desk that he had just killed his wife. He also gave a statement to Lieutenant Richard Catellier in which he provided some details of the killing.

A pathologist testified that there were eight stab wounds to her chest. Two stab wounds pierced her heart. One, between six and one-half and seven inches deep, passed through the heart. A third wound pierced the inferior vena cava. Any one of those three wounds would have produced death. Another knife wound severed two ribs on the left side of her chest. She remained conscious for approximately four to five minutes.

The defendant testified at trial. He said he thought constantly about Victoria over the 1993 Labor Day weekend and could not sleep. He confirmed the details given by Commonwealth witnesses about his efforts to try to find where Victoria and her male friend had gone. On the morning of Friday, September 3, he sought treatment at Mercy Hospital in Springfield for depression. He was diagnosed with gastritis and was given a prescription that was never filled. He said that his state of mind improved as the weekend progressed. He was no longer feeling depressed when he walked over to Victoria's house on the evening of September 6, to ask one of his sons if he could bor-

row a car. He said that Victoria was outside, and she invited him in. Once inside, she accused him of taking her check, which he denied. He told her it was on the refrigerator. She threatened to telephone the police, and went upstairs. He said he tried to stop her and followed her to her bedroom. He saw a condom and a knife in an open dresser drawer, and then "[e]verything just went crazy. I started seeing a merry-go-round, a Ferris wheel with the numbers on it. . . . I grabbed the knife and . . . stabbed her . . . ." He claimed he was not aware that he was stabbing her at the time it happened. The defendant testified that he drove Victoria's car to the service station where he had left his son's car,[4] retrieved some personal effects, then drove to his apartment and gathered the rest of his belongings. He contemplated suicide, and drove to a friend's house where he left his belongings and a note on the porch. He walked the streets, still thinking of ending his life, but decided that suicide would only cause his sons more pain. He walked to a convenience store and asked the clerk to telephone his brother with instructions to go to Victoria's house.[5] From there the defendant said he went to the State police barracks and turned himself in.

Dr. Ronald S. Ebert, a forensic psychologist, testified on behalf of the defendant. Based on five hours of interviews with the defendant on two occasions, and his review of police reports, witness statements, statements of family members, hospital records, and mental health records from the Hampden County house of correction, where the defendant had been held pending trial,[6] Dr. Ebert opined that the defendant was suffering from alcoholism, and an acute state of depression with psychotic features. He further opined that, although the defendant did not lack criminal responsibility, he was overcome by a flood of emotion and his capacity to form the intent to kill was diminished at the time he stabbed Victoria. On cross-examination, Dr. Ebert stated that the defendant had the capa-

[4]He claimed he left it there because of mechanical problems. His son testified that his car had no problems when he later went to get it.

[5]The store clerk verified the incident, but she could not positively identify the defendant as the man who entered the store.

[6]The defendant had no prior history of mental illness.

city to premeditate and to harbor malice up to the moment he began to hallucinate and stab his wife, but that such capacity was diminished.[7]

The Commonwealth offered expert rebuttal testimony through Dr. Wesley Profit, then director of forensic services at Bridgewater State Hospital. Dr. Profit had examined the defendant several times for a total of seven hours. He spoke with staff members at Bridgewater who had observed the defendant while he was held there for examination on the question of criminal responsibility. He also reviewed police reports, witness statements, and Mercy Hospital records. He opined that the depression experienced by the defendant at various times during his life was not clinically significant, and that at the time of the stabbing the defendant was not suffering from any significant mental illness, that he did not lack criminal responsibility, and that the depression he was experiencing did not interfere with his ability to meet the ordinary demands of life or produce a psychotic break with reality. Dr. Profit did not form an opinion as to whether the defendant suffered from a "diminished capacity" because he had not been asked to examine him for that purpose, but he did testify that in his opinion the defendant had the capacity to deliberately premeditate and act with malice aforethought at the time of the killing.

2. *Jury issues.* (a) The defendant contends that the judge did not adequately question a prospective juror with respect to his impartiality. The juror said that he was a friend of a Commonwealth witness, but in response to questioning from the judge indicated that he could remain impartial. That juror was not excused and was not challenged, and there was no objection to the judge's questioning. We review to determine if any error caused a substantial likelihood of a miscarriage of justice. We will not disturb a judge's finding of juror impartiality absent a clear showing of an abuse of discretion or that the finding was clearly erroneous. See *Commonwealth* v. *Emerson*, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000). The judge

---

[7]"Diminished capacity" is not a defense in this Commonwealth. See *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998), and cases cited.

was in the best position to assess the juror's credibility, see *Commonwealth* v. *Daughtry*, 417 Mass. 136, 147 (1994), and a judge may rely on a juror's assertion of impartiality. See *Commonwealth* v. *Gregory*, 401 Mass. 437, 444 (1988). Mere friendship with a potential witness, without more, does not disqualify a juror. Cf. *Commonwealth* v. *Amazeen*, 375 Mass. 73, 83 (1978) (prospective juror knew prosecutor). There was no error.

(b) During the third day of trial another juror was seen in a court house elevator with Victoria's relatives. In response to questions from the judge, the juror indicated that nothing had been said about the case. There was no objection to the questioning. The judge was entitled to credit the juror's response that the case was not discussed. See *Commonwealth* v. *Martinez*, 431 Mass. 168, 179-180 (2000). There was no error.

(c) At the beginning of the second day of trial a third juror asked to address the judge. The judge asked counsel if there was any objection to conducting a hearing at the sidebar. Hearing none, the judge proceeded without the presence of the defendant. The juror reported that she could not look at the photographs and that it was difficult to listen to the testimony. She said she could not sleep, was "physically sick," and could "not do what need[ed] to be done." The judge invited counsel to inquire. The judge excused the juror without objection.

The defendant argues, as he did in his motion for a new trial, that it was a violation of due process and his right of confrontation under both the State and Federal Constitutions, as well as Mass. R. Crim. P. 18, 378 Mass. 887 (1979), to discharge the juror in his absence. The motion judge considered the merits of the issue and thereby resurrected it for full appellate review. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). He concluded that, although it was error to hold the hearing in the defendant's absence, the error was harmless because there was sufficient cause to dismiss the juror.

When a judge conducts an inquiry into a consequential matter involving allegations that call into question the impartiality of a trial juror, a defendant is entitled to be present. See *Commonwealth* v. *Martino*, 412 Mass. 267, 286 (1992). Contrary to the defendant's claim, "[t]he absence of the defendant from such a colloquy, however, does not automatically constitute

reversible error." *Id.* See 2 C.A. Wright, Federal Practice and Procedure § 388, at 578-579 (3d ed. 2000). The standard of review is whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Owens*, 414 Mass. 595, 603 (1993); *Commonwealth* v. *Hicks*, 22 Mass. App. Ct. 139, 147 (1986). See also 3A C.A. Wright, Federal Practice and Procedure § 724 (2d ed. 1982).

It is apparent that the judge accepted the juror's statements that she was physically ill, having difficulty paying attention, and not up to the task of her oath as a juror. Both the Commonwealth and the defendant are entitled to an attentive jury, see *Commonwealth* v. *Rock*, 429 Mass. 609, 614 (1999), and the defendant does not contend otherwise. The defendant does not suggest that the judge's decision to discharge the juror was unsupported by the record or that it was otherwise an abuse of discretion. The defendant's presence at the hearing would not likely have yielded anything or altered its outcome. The judge properly eliminated the risk that an indisposed juror who was unable to absorb the testimony and the exhibits might participate in the deliberations. There is no suggestion that the remaining jurors were not fair and impartial. See *Commonwealth* v. *Olszewski*, 416 Mass. 707, 721 (1993), cert. denied, 513 U.S. 835 (1994). We are satisfied that the discharge of the juror in the absence of the defendant was harmless beyond a reasonable doubt.[8]

There is no merit to the defendant's claim that reversal is required because the judge failed to address considerations we identified in *Commonwealth* v. *Martino, supra.* That case involved the discharge of a deliberating juror, a decision that involves entirely different considerations from those at hand. "The risk, at that crucial stage of a trial, is that a juror may

[8]Although the motion judge resurrected the issue as if an objection had been made, we consider the absence of an objection in circumstances here as a perception by trial counsel that there was no prejudice. When trial counsel, who is not appellate counsel, was prevented from exercising his first nine peremptory challenges against women, see *J.E.B.* v. *Alabama*, 511 U.S. 127, 130-131 (1994) (unconstitutional to use peremptory challenges to target women), he stated that he was purposefully trying to exclude women because the victim was a forty year old housewife who had died of multiple stab wounds to the heart and chest. Removal of the juror in question was consistent with that initial strategy in which the defendant participated.

seek discharge based on hardship or illness when his opinion as to the defendant's guilt is not in accord with the opinions of the other jurors." *Commonwealth* v. *Olszewski, supra* at 722 n.15.

3. *Evidentiary issues.* (a) The defendant argues that the judge erred on three occasions by admitting evidence of Victoria's expressions of fear after she received telephone calls from him. He contends that the evidence of her state of mind was not relevant to his motive or degree of culpability. See *Commonwealth* v. *Cyr*, 425 Mass. 89, 93 (1997), *S.C.*, 433 Mass. 617 (2001). On two occasions there was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. Where there was an objection, we review under the nonprejudicial error standard. The evidence was properly admitted as a spontaneous utterance. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 363-365 (2001); *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994). Although it was evidence of Victoria's state of mind, it was relevant to the defendant's intent and motive. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 511 & n.5 (1997), *S.C.*, 433 Mass. 439 (2001). The jury could have inferred from this evidence of her state of mind, and from the evidence that Victoria reported to police that the defendant violated the domestic abuse protective order by going to her house over the weekend, that she did not want him at her house and would not have invited him inside, and that she would report him to police for violating the protective order, if he came to her home. The jury also could have inferred that the defendant knew how she felt because he had asked his son not to tell Victoria that he had been at the house. See *id.* The defendant told Catellier that he went to Victoria's house to confront her because she was seeing another man. The jury could have inferred from the defendant's willingness to go to Victoria's house while she was there that he anticipated a confrontation of such magnitude that the consequences of violating either the domestic abuse protective order or her wishes that he stay away were relatively insignificant. There was no error.

(b) The defendant claims error in the admission of evidence, over objection, that he telephoned Victoria's male friend at 1:50 A.M. on September 7, as the male friend could not authenticate the voice of the caller as that of the defendant. The circum-

stances authenticated the defendant as the caller. The caller identified himself as "Joe," Victoria's male friend identified the caller as the same person who had previously called him (and who also claimed to be "Joe Sleeper") shortly after Victoria and he returned from a wedding they attended out of town, and the apocalyptic nature of the telephone call suggested that the caller was privy to circumstances that would fall imminently on Victoria's male friend — he would soon learn that his relationship with Victoria had ended because within ten minutes the defendant would tell police that he had killed her. There was no error. See *Commonwealth* v. *Anderson,* 404 Mass. 767, 769-770 (1989); *Commonwealth* v. *Loach,* 46 Mass. App. Ct. 313, 316 (1999).

(c) The defendant contends that on six occasions the prosecutor improperly impeached him with evidence of prior bad acts. On the first three occasions the prosecutor was merely revisiting material that had been elicited during the defendant's direct examination and there was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice.

The first line of questioning was based on the defendant's direct examination where he said that he was drinking "a tremendous amount" of alcohol, and that, "I knew I had a problem with alcohol." The second line of questioning arose from the defendant's direct examination where he testified that he often stayed out all night after he and Victoria separated because he "didn't care anymore about getting home right after work. I would go to Salvatore's drinking. I stayed there, I didn't care what time." The third harkened back to the defendant's testimony that he filed his own action for divorce. When a defendant testifies he subjects himself to cross-examination, and the scope of that examination lies within the sound discretion of the trial judge. See *Commonwealth* v. *Perez,* 390 Mass. 308, 316 (1983). The defendant introduced the subjects on which he now claims he was impermissibly cross-examined, and there is no indication that the prosecutor pursued those subjects in an improper manner. Cf. *id.* at 317-318. There has been no showing that the judge abused his discretion with respect to cross-examination on these three occasions.

The defendant was impeached, over objection, with evidence of a Foxwoods Casino "comp card" found in his wallet when he was arrested. The defendant had testified on direct examination that he was a "head of the household type man," and needed money in the spring of 1992 because a "kid" with whom he traveled stole all his clothes and his money. As a result, he surrendered his 401K account to pay household bills, but he said Victoria seized the check to pay them herself. He eventually took the check and paid the bills. The "comp card" entitled the bearer to free meals and other courtesies, and was given to Foxwoods customers who gambled at a certain level. The defendant explained that it had been given to him by a woman he dated who worked at Foxwoods, and that although he enjoyed gambling his indebtedness was not due to gambling. There was no error, as there was basis to inquire whether the defendant's inability to pay his family's ordinary obligations was due to his having been a victim of a theft or a result of his gambling activities. The scope of cross-examination was properly contained, and the prosecutor did not make unfair use of the evidence.

Contrary to the defendant's contention, the prosecutor never insinuated any impropriety in the defendant's debt to one of his sons, a subject introduced during his own direct examination.

The defendant argues that the prosecutor improperly cross-examined him about his reason for leaving his job. The defendant testified on direct examination that he left his job to pursue a significant opportunity in New York City. He said that he had become "known as the grandfather of natural gas" in a global movement to develop an alternative fuel for motor vehicles. The prosecutor had information that the defendant left his job because he would be fired for misappropriating equipment if he did not tender his resignation. Concerned about collateral prejudice, the judge would not permit inquiry beyond asking the defendant if he was given the choice of being fired or resigning. The defendant said he could not recall being given that choice, and he did not produce any evidence in his motion for a new trial suggesting that the prosecutor had no basis for the question. This omission is particularly significant where he indicated that he and the person whom the prosecutor relied on

as his source of information were "very good friends." There was no error.

(d) The defendant contends that, because Dr. Profit had not made a determination about "diminished capacity," it was error to permit him to testify, over objection, that, at the time of the stabbing, the defendant was capable of conforming his conduct to the requirements of the law, could premeditate, harbor malice, and distinguish right from wrong. The record reveals that there was no objection to the point now raised on appeal. Dr. Profit's opinion addressed the question of criminal responsibility, a defense for which the defendant gave notice pursuant to Mass. R. Crim. P. 14 (b) (2) (A), 378 Mass. 874 (1979). Dr. Profit was not prohibited from also expressing an opinion that addressed other aspects of the defendant's mental condition, particularly those raised in the testimony of Dr. Ebert that touched on the defendant's ability to deliberately premeditate or act with malice aforethought. Those issues were central to the case. Any shortfall in his testimony went to the weight of his opinion and was explored by trial counsel on cross-examination. Moreover, there is no defense of "diminished capacity," as such. See *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998). Thus, there was no requirement that Dr. Profit express an opinion on "diminished capacity" before giving testimony on issues that were relevant to the case. There was no error.

4. *Prosecutor's closing argument.* (a) The defendant contends that the prosecutor violated the rule of *Doyle* v. *Ohio*, 426 U.S. 610, 617-619 (1976), first by soliciting testimony that a State trooper who interrogated him did not obtain a written statement because the defendant invoked his right to counsel, and again by comments during his closing argument. There was no objection, so we review to determine whether any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 42 & n.20 (2000).

After he was advised of the Miranda rights and acknowledged that he understood them, the defendant said he was willing to speak to Catellier. Catellier interrogated the defendant while the officers assigned to the investigation were en route to the barracks. He left shortly after they arrived, and subsequently reduced his recollection of the interview to writing and testified about what the defendant had told him.

Trial counsel asked Catellier on cross-examination if he gave the defendant an opportunity to review any writing that contained his statement. He said that he did not. The prosecutor later asked Trooper Bruce Hiorns, who was assigned to investigate the case, whether he obtained a written statement from the defendant after he replaced Catellier in the interrogation. Hiorns said that he had not. When asked to explain, he stated that the defendant said he wanted to get a lawyer, at which point questioning ceased. This testimony was not used against the defendant, but to explain why a written statement had not been taken and shown to the defendant to review, as response to trial counsel's insinuation that such a procedure would have been the fair thing to do. Such use of evidence of a defendant's exercise of his right to counsel is entirely appropriate. See *Commonwealth* v. *DePace*, 433 Mass. 379, 384 (2001).

The prosecutor's comment during closing argument in which he invited the jury to consider what the defendant said, and did not say, to Catellier was not a comment on the defendant's silence, but fair argument on the differences between what the defendant told Catellier and what he told the jury. See *Commonwealth* v. *Martino*, 412 Mass. 267, 283-284 (1992). The prosecutor did not violate the rule of *Doyle* v. *Ohio*, *supra*, by making improper comment on the defendant's exercise of his right to silence or to counsel.

(b) The defendant claims that the prosecutor improperly asked the jury to consider the defendant's interest in the case when assessing his credibility, and thereby eroded the presumption of innocence guaranteed by the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Although there was no objection, the motion judge resurrected the issue by considering its merits on the defendant's motion for a new trial. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). Contrary to the defendant's assertion, the prosecutor did not suggest that the defendant should be disbelieved simply because he had been indicted. The prosecutor spent a substantial portion of his closing argument reviewing inconsistencies between the defendant's testimony and his prior statements, the testimony of persons who had no discernible

interest in the case, and objectively ascertainable facts. The argument was anchored to the evidence, and it was entirely appropriate for him to ask the jury to consider the defendant's interest in the case as a motive for his testifying as he did. When a defendant testifies on his own behalf, he exposes himself to cross-examination as would any witness. See *Jenkins* v. *Anderson*, 447 U.S. 231, 236 (1980); *Commonwealth* v. *Hicks*, 375 Mass. 274, 278 (1978). This is also true with respect to credibility. See *Portuondo* v. *Agard*, 529 U.S. 61, 69 (2000). The judge instructed the jury that they could consider the interest that any witness has in the outcome of the trial when assessing the credibility of that witness. The defendant does not challenge that instruction. The argument was not improper.

(c) The defendant challenges other portions of the prosecutor's closing argument that were not included in his motion for a new trial and to which no objection was made at trial. We review under the standard of a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993).

(i) The prosecutor's references to the defendant's lies were not unfair comment. They had firm basis in the evidence and were not an expression of personal belief. See *Commonwealth* v. *Oliveira*, 431 Mass. 609, 613 (2000). In each instance the prosecutor's premise was either that the defendant had testified to a version that differed from what he told the police, that the defendant minimized what he had done, that the defendant's testimony was preposterous, or that the defendant admittedly had lied to people in his attempt to locate Victoria over the Labor Day weekend. His argument was proper. *Id.* See *Commonwealth* v. *Cohen*, 412 Mass. 375, 388 (1992). Contrast *Commonwealth* v. *Waite*, 422 Mass. 792, 801 & n.8 (1996) (prosecutor's characterization of defendant as "liar" improper where defendant did not testify at trial); *Commonwealth* v. *Kosilek*, 423 Mass. 449, 458 n.12, 459 (1996) (same).

(ii) Contrary to the defendant's assertion, the prosecutor did not elicit evidence that the defendant was in jail pending trial. Trial counsel elicited this evidence during his direct examination of Dr. Ebert, who said he interviewed the defendant first at the Hampden County jail and later at Bridgewater State

Hospital. The prosecutor's comment that the cause of the defendant's depression was his confinement in jail on a charge of murder in the first degree was proper. Both Dr. Ebert and Dr. Profit testified that the defendant's present circumstances (lack of freedom) could be expected to cause depression. The comment had basis in the evidence and was fair argument.

(iii) The defendant cites seven additional instances where he claims that the prosecutor misstated trial counsel's opening statement, misstated the evidence, and misstated the law. His contentions are themselves misstatements or mischaracterizations of what the prosecutor said. We have reviewed the prosecutor's closing argument and are satisfied that the challenged portions constitute fair comment based on the evidence. Any lapses were inconsequential. His statements about the law, even if not accurate, were cured by his own acknowledgment that the judge, and not he, would instruct them on the law, see *Commonwealth* v. *Fisher*, 433 Mass. 340, 347 n.6 (2001). The judge instructed the jury at the beginning of the trial and in his final instructions that arguments of counsel are not evidence, and he instructed the jury that it was their duty to apply the law as he explained it. The jury are presumed to have followed such an instruction. See *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000). There was no prosecutorial misconduct.

5. *Jury instructions.* The defendant argues that the judge committed error in numerous aspects of his instructions. As to the first four assignments of error, there was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Vinton*, 432 Mass. 180, 188 (2000). We examine the charge in its entirety with a view to what a "reasonable jury could have interpreted the charge" to mean. *Commonwealth* v. *Nieves*, 394 Mass. 355, 360 (1985). See *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990).

(a) The judge instructed the jury on the elements of murder in the second degree before instructing them on murder in the first degree. The defendant argues that this was the type of error that required reversal in *Commonwealth* v. *Sama*, 411 Mass. 293, 299-300 (1991). In that case the judge directed the jury to consider whether the Commonwealth proved murder in the

second degree before determining whether it proved murder in the first degree. We held that that was error because "[m]urder in the first degree and murder in the second degree cannot coexist." *Id.* at 300. Instructing the jury on the elements of murder in the second degree before defining murder in the first degree, without directing the order of the jury's determination of the degrees of murder, as here, is not error. See *Commonwealth* v. *Rosado*, 434 Mass. 197, 207, cert. denied, 122 S. Ct. 372 (2001).

(b) The defendant contends that the judge's instruction on premeditation was confusing, where he first said that the period of reflection "may be a matter of months, weeks, days, hours, or minutes," and later added "or even seconds" to the series. The series of different lengths of time does not define deliberate premeditation, but is merely illustrative of the concept. Deliberate premeditation is the resolve to kill after a period of reflection, and no particular period of reflection is required. "As such, it is the sequence of the thought process rather than the time which is taken to think that is the key to determining whether someone acted with deliberate premeditation." *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). That thought process is usually characterized as "[f]irst the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution." *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905). The judge's instructions comported with the *Chipman* and *Tucker* cases. There was no error.

(c) There is no merit to the defendant's claim that the jury were erroneously instructed that the Commonwealth need only prove that he was *capable* of forming the specific intent to kill, rather than proving that he actually formed the specific intent to kill. The judge first instructed the jury on malice, then he instructed the jury conformably with *Commonwealth* v. *Grey*, 399 Mass. 469, 471 (1987), that, "in determining whether or not the defendant *acted with malice, malice aforethought*, the jury may take into consideration and may consider the evidence with regard to the defendant's mental state, mental condition at the time of the act" (emphasis added).

In response to a jury question for reinstruction on the degrees

of murder and manslaughter, the judge instructed that malice aforethought required a showing that the defendant "*acted with the . . . specific intent of killing* the victim" (emphasis added). This instruction on malice aforethought was followed by an instruction that the jury could consider evidence of the defendant's mental condition on the question whether he was capable of forming a specific intent. This was followed by an instruction on murder in the first degree during which the judge said: "[T]he Commonwealth must prove and prove beyond any reasonable doubt, not only that he *acted with malice afore-thought,* but also that he acted with, that his action was the product of a cool reflection" (emphasis added). Although the instruction that the jury could consider evidence of the defendant's mental state when deciding whether the Commonwealth had met its burden of proof as to malice aforethought was less clear during the reinstruction than in the original charge, the reinstruction, taken as a whole, would not have led a reasonable juror to have interpreted it to mean that the Commonwealth only had to prove a capacity to intend the killing rather than proof that the defendant acted *with* the intent to kill, and thus actually formulated the requisite intent. See *Commonwealth* v. *Carrion,* 407 Mass. 263, 270 (1990); *Commonwealth* v. *Nieves,* 394 Mass. 355, 360 (1985).

(d) Contrary to the defendant's contention, the judge correctly instructed the jury that, in order to obtain a conviction of murder, the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion on adequate provocation. Cf. *Commonwealth* v. *Boucher,* 403 Mass. 659, 662-663 (1989).

(e) The defendant objected to the instruction on consciousness of guilt as it related to his disposal of the knife he used to kill his wife. He argues that the instruction should not have been given because there was no question at trial that he killed his wife, and "consciousness of guilt . . . cannot be used to prove that a homicide was a murder rather than a manslaughter." Because the defendant preserved the issue for review, we consider it under the nonprejudicial error standard. See *Commonwealth* v. *Jones,* 432 Mass. 623, 630 (2000). The Commonwealth was not precluded from introducing evidence of

consciousness of guilt to prove its case as if it were disputed in its entirety. "The defendant's willingness to stipulate to a fact does not preclude the Commonwealth from proving it." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 820 (1980), quoting *Commonwealth* v. *Nassar*, 351 Mass. 37, 46 (1966), *S.C.*, 354 Mass. 249 (1968), cert. denied, 393 U.S. 1039 (1969). The evidence was relevant to the question of the defendant's identity as the killer. In addition, as we said in *Commonwealth* v. *Cohen*, 412 Mass. 375, 393 (1992), "it was not logical for the jury to have inferred malice aforethought from the judge's instructions on consciousness of guilt." There was no error.

(f) The defendant argues that the judge's instructions on reasonable doubt and the presumption of innocence were defective in several respects. He raised these issues in his motion for a new trial and the motion judge resurrected them by considering the merits of his claim. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). However, an "error[] in the reasonable doubt instruction which allowed the jury to convict the defendant on a burden of proof less than beyond a reasonable doubt . . . would necessarily require a new trial. . . . Therefore, discussion of the level of review . . . is unnecessary." *Commonwealth* v. *LaBriola*, 430 Mass. 569, 570-571 n.3 (2000). The defendant argues that the moral certainty language should have been linked to the burden-enhancing language. See *Victor* v. *Nebraska*, 511 U.S. 1, 16 (1994); *Cage* v. *Louisiana*, 498 U.S. 39, 41 (1990). We rejected a similar challenge to a nearly identical charge given by the same judge in *Commonwealth* v. *Watkins*, 425 Mass. 830, 836-839 & n.9 (1997). The concept of moral certainty was integrated by context into the heightened degree of certainty the jury were told was needed to justify a conviction. See *Commonwealth* v. *Pinckney*, 419 Mass. 341, 345 (1995). The jury were also told that the proof must "fully convince[] you as reasonable persons now earnestly seeking the truth that the defendant is guilty." This was "sufficient to. convey to the jury the requisite degree of certainty required for conviction." *Commonwealth* v. *Watkins*, *supra* at 839.

The defendant claims that use of the phrase "reasonable person seeking the truth," combined with the reference to the

civil standard of proof, impermissibly reduced the Commonwealth's burden. We rejected a similar argument in *Commonwealth* v. *Watkins, supra.* See *Commonwealth* v. *Lanoue,* 392 Mass. 583, 590-591 (1984), *S.C.,* 400 Mass. 1007 (1987), and 409 Mass. 1 (1990) (permissible to describe reasonable juror as one "earnestly seeking the truth and not looking for a doubt"). The judge carefully explained that the burden of proof in a criminal case is "much greater than" a fair preponderance of the evidence, the standard of proof in civil cases. Although reference to the civil standard is not recommended, when used with instructions that properly define proof beyond a reasonable doubt, as here, there is no error. See *Commonwealth* v. *Payne,* 426 Mass. 692, 699 & n.7 (1998).

The defendant also challenges the judge's use of the word "satisfied" twenty times in the burden of proof instruction. The use of the word "satisfied" did not impermissibly suggest that the defendant had any burden to prove anything. Contrast *Connolly* v. *Commonwealth,* 377 Mass. 527, 535 (1979) ("finding" language). The judge instructed the jury emphatically that the Commonwealth was required to prove guilt before a defendant could be convicted, and that a defendant had no burden to prove his innocence. Viewing the charge as a whole, no reasonable juror could have understood that the defendant was required to prove anything. There was no error in the reasonable doubt instruction.

The defendant faults the judge's instruction on the presumption of innocence as "bare-boned and untraditionally sparse." The failure to give a presumption of innocence instruction does not in and of itself violate the Constitution. See *Kentucky* v. *Whorton,* 441 U.S. 786, 789-790 (1979). We have said that when judges give a presumption of innocence instruction, they "need not give any particular content to the phrase 'presumption of innocence,' if the instructions make clear that an indictment does not imply guilt, and that the jury must base their decision on the evidence, and not on 'suspicion or conjecture.' " *Commonwealth* v. *Drayton,* 386 Mass. 39, 46 (1982). The judge made these points abundantly clear, particularly as the presumption of innocence instruction was juxtaposed with the reasonable doubt instruction. There was no error.

(g) The defendant argues that the judge erred by refusing to give a requested insanity instruction. There was no evidence which, "if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime]." *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246-247 (1977). Although expert testimony is not required to raise the issue, see *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979), here both experts testified that the defendant was not insane. There was no evidence that the defendant had a history of mental illness. See *Commonwealth* v. *Johnson*, 422 Mass. 420, 426 (1996). Suicidal ideation alone does not justify an insanity instruction. See *Commonwealth* v. *McInerney*, 373 Mass. 136, 152 (1977). Cf. *Commonwealth* v. *Mills*, 400 Mass. 626, 630-631 (1987) (suicidal ideation, together with failure to remember stabbing victim, telling officer to kill him, and walking into oncoming traffic, sufficient to warrant insanity instruction). Something more than a defendant's own characterization that he "just went crazy" is necessary. See *Commonwealth* v. *Mattson*, *supra* at 643. The defendant claimed to have heard the voices of his parents and of a friend, but he had heard those voices over an extended period of time and there was no indication that the voices had any relation to the killing. Evidence of the "flood" of emotions the defendant experienced does not rise to the level of a mental disease or defect that caused the defendant to lose the substantial capacity either to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of the law. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-548 (1967). The expert evidence expressly indicated that it did not. See *Commonwealth* v. *Dunton*, 397 Mass. 101, 104 (1986). There was no evidence that the defendant acted irrationally. Cf. *Commonwealth* v. *Mills*, *supra*. His conduct after the killing, including the collection of his personal belongings, his contemplation of suicide, the telephone call to Victoria's male friend, turning himself in to police, and his recollection of the details of what he had done suggest that he understood the wrongfulness of his conduct. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 516-517 (1997). The evidence was insufficient to warrant an instruction on insanity. There was no error.

(h) Last, the defendant claims he was entitled to a "humane

practice" instruction, and that the judge was obligated to give the instruction sua sponte. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 150-151, cert. denied, 457 U.S. 1137 (1982). "A judge has 'no duty to ask the jury to pass on voluntariness [of a confession or admission] unless it is made a live issue at trial.' " *Id.* at 150, quoting *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1976). See *Commonwealth* v. *Murphy*, 426 Mass. 395, 298 (1998). Because the motion judge resurrected this issue, it is before us as if trial counsel requested such an instruction.

The defendant did not seriously contest the fact that he killed his wife. His trial strategy was to portray himself as a decent, law-abiding citizen who snapped, then turned himself in and cooperated with the police four and one-half hours after the killing. A challenge to the voluntariness of his statements would have been inconsistent with the image of himself that he had been portraying to the jury. See *Commonwealth* v. *Benoit*, 410 Mass. 506, 516-517 (1991). Moreover, there was nothing in the testimony to suggest that the defendant's statements to police were coerced, see *Colorado* v. *Connelly*, 479 U.S. 157, 167 (1986), or that "the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995), *S.C.*, 426 Mass. 168 (1997). There was no error.

6. *Claim of ineffective assistance of counsel.* (a) The defendant argues, as he did in his motion for a new trial, that trial counsel was ineffective because of a "promise" he made in his opening statement that the defendant would present an insanity defense, even though he knew that no evidence would be produced to support that defense. The defendant relies on *Anderson* v. *Butler*, 858 F.2d 16, 17-19 (1st Cir. 1988). In that case trial counsel told the jury that a psychiatrist and a psychologist would testify as to his client's mental state, but never produced those witnesses. A divided *Butler* court said, *supra*:

> "The promise [by counsel] was dramatic . . . the first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling . . . unable, to live up to their

billing. . . . [W]e cannot but conclude that to promise even a condensed recital of such powerful evidence, and then not producing it, could . . . be disregarded as harmless. We find it prejudicial as matter of law."

We review the defendant's claim under the standard required by G. L. c. 278, § 33E, a standard more favorable to the defendant than the constitutional standard for reviewing claims of ineffective assistance of counsel. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We review to determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.*

In his opening statement trial counsel described the defendant as being "insane at the time he did it," and he suggested that events "drove him crazy," and that at the time of the killing the defendant was "absolutely frenzied." There was no broken promise, as in *Butler* v. *Anderson, supra,* about the presentation of expert testimony. There was considerable testimony about the defendant's mental state, including the testimony of two forensic psychologists. Dr. Ebert testified that the defendant was depressed and overwhelmed by a flood of emotions. Even Dr. Profit acknowledged that the defendant may have experienced some depression, though not to the degree to which Dr. Ebert testified. Trial counsel's opening statement was reasonably predictive of the trial that unfolded.

Trial counsel told the jury that they would be asked "to determine whether or not [the defendant] committed first degree murder, second degree murder, manslaughter, *or was insane at the time he did it*" (emphasis added). This was followed immediately by the statement: "I'm not going to . . . explain to you what they are, that is [the judge's] job at the end of all the evidence." Counsel no doubt misspoke, but this did not amount to a promise that was later broken. Viewing the opening statement as a whole, trial counsel's use of the word "insane" was an unfortunate colloquialism to describe the defendant's distraught state of mind about which the jury would hear.

In the context of the entire trial, counsel's statement was

inconsequential. His direct examination of Dr. Ebert and his cross-examination of Dr. Profit were controlled, appropriate examinations of the subject of the defendant's mental condition and how it affected his ability to form the requisite intent to commit murder, his so-called "diminished capacity," with no suggestion of insanity. Dr. Ebert distinguished, as did Dr. Profit, the insanity defense from evidence that the defendant could not form the requisite intent to commit murder because of his mental condition at the time of the killing. It was apparent from trial counsel's preparedness and consistency in strategy that any reference to insanity in his opening was never meant to suggest the promise of an insanity defense, but a signal that the defendant's mental state was the central issue, and no reasonable juror would feel "disappointed" by the defense. *Anderson* v. *Butler, supra* at 17. Trial counsel was not ineffective in his opening statement.

(b) The defendant claims that trial counsel was ineffective for all of the assignments of error presented in this appeal. Because these claims are duplicative of claims of error that did not create a substantial likelihood of a miscarriage of justice, there is no ineffective assistance of counsel. See *Commonwealth* v. *Waite*, 422 Mass. 792, 807 (1996); *Commonwealth* v. *Cohen*, 412 Mass. 375, 389 (1992).

7. *Motion for a new trial: exculpatory evidence.* The defendant made a claim in his motion for a new trial that the prosecutor failed to disclose exculpatory evidence. See *Brady* v. *Maryland*, 373 U.S. 83 (1963). The defendant moved before trial for disclosure of exculpatory material, including "[a]ny material or information that can be used for the purpose of impeaching the credibility of any person that the Commonwealth intends to call as a witness at the trial." After trial the defendant learned that Dr. Profit had been a defendant in a civil action alleging sexual misconduct years earlier against a nonpatient, noninmate who also had complained to the Board of Registration of Psychologists (board) in 1991. After investigation, the board closed its case without taking any action against Dr. Profit, and the civil action settled. The board also closed a second case after investigation, based on allegations by inmates of sexual misconduct by Dr. Profit, without taking any disciplin-

ary action. He had not been suspended from his duties, as the defendant claims. At the time Dr. Profit testified in the defendant's trial, he had agreed not to see patients until these matters were resolved, but he continued to serve as forensic director of Bridgewater State Hospital and continued to supervise psychologists and psychiatrists, review reports, and attend to other administrative duties. He was a private vendor, not a State employee, at the time he testified. Dr. Profit was not the subject of a criminal investigation at the time of his testimony in the defendant's trial.

"A prosecutor's duty [to disclose exculpatory evidence] extends only to exculpatory evidence in the prosecutor's possession or in the possession of the police who participated in the investigation and presentation of the case." *Commonwealth* v. *Tucceri*, 412 Mass. 401, 407 (1992). Members of the prosecution team to whom the duty extends includes "members of [the prosecutor's] staff and . . . any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to [the prosecutor's] office." *Commonwealth* v. *Daye*, 411 Mass. 719, 734 (1992). After an evidentiary hearing the motion judge found that, although Dr. Profit was a witness, he was not a member of the prosecution team who had a duty to disclose this information about himself. The motion judge also found that neither the prosecutor nor any member of his team was aware of Dr. Profit's circumstances. These findings were supported by the evidence and were not plainly wrong. The judge's conclusion that the prosecutor thus had not violated the duty to disclose was not clearly erroneous.

The motion judge also determined that the impeachment evidence would not have been admissible. To the extent that the evidence showed prior misconduct, it was not admissible for impeachment purposes. See *Commonwealth* v. *Gonzalez*, 11 Mass. App. Ct. 932 (1981) (evidence that Federal agent was under investigation for improper conduct in unrelated case held inadmissible). In addition, the evidence did not tend, even remotely, to suggest bias. See *Commonwealth* v. *Johnson*, 431 Mass. 535, 538 (2000). Because there was no evidence that the prosecutor was even. aware of the pending investigation before

the board, and Dr. Profit did not disclose the fact, Dr. Profit logically could not have thought that favorable testimony for the Commonwealth at the defendant's trial might help him with the board. Thus, there was no nexus between any possible bias the witness might have toward this prosecutor's office and what was pending before the board. Cf. *Commonwealth* v. *Henson*, 394 Mass. 584, 588 (1985) (defendant had right to inquire as to charges pending in same county against witness where defendant was being tried). The motion judge did not abuse his discretion in concluding that the evidence was not admissible.

*Lindh* v. *Murphy*, 124 F.3d 899, 900 (7th Cir. 1997), cert. denied, 522 U.S. 1069 (1998), on which the defendant relies, is not to the contrary. In that case the court held that it was unfair to foreclose impeachment of a government's psychiatrist witness with evidence of pending criminal charges for sexual assault because the prosecutor, knowing in advance that impeachment would not be allowed, presented the psychiatrist as a person of the highest caliber, with impeccable and unassailable personal as well as professional credentials. This was so even where the office prosecuting the defendant was not the same office prosecuting the witness, and the former was ethically prohibited from attempting to influence the latter. Here, the prosecutor did not mislead the jury as to Dr. Profit's personal and professional credentials and thereby take unfair advantage of an advance evidentiary ruling preventing impeachment. There was no such ruling and the prosecutor was unaware of the impeachment evidence.

The motion judge implicitly found that, even if the evidence were admissible, it would not have affected the jury's verdict, that is, it would not have created a reasonable doubt that otherwise did not exist. See *Commonwealth* v. *Vieira*, 401 Mass. 828, 832 (1988), and cases cited. The motion judge found that any error was harmless because Dr. Profit "had no motive . . . to alter his testimony" to please the Commonwealth and the defendant failed to show that Dr. Profit was concerned about criminal prosecution. Dr. Profit's trial testimony was consistent with his written report, which predated the civil action. In addition, Dr. Profit's testimony was primarily directed at the question of criminal responsibility. Even though Dr. Profit gave

testimony that touched on the defendant's ability to form the requisite intent to commit murder, most of the damage done to the defense came during cross-examination of Dr. Ebert, who testified that the defendant was "rational and lucid," and that he had the capacity to premeditate and to harbor malice. The case generally was highly unsupportive and unsympathetic to the defense. The judge's findings were not clearly erroneous.

Finally, the defendant claims that Dr. Profit misrepresented his credentials when he indicated, "I have an appointment to the Harvard Medical School as an instructor of psychology in the department of psychiatry." At the hearing on the motion for a new trial, Dr. Profit testified that it was an "honorary" position in which he lectured and trained four fellows, hand-picked from a national search, on forensic psychiatry. The testimony did not fall within the defendant's motion for exculpatory evidence, and it did not satisfy the defendant's burden to show that "there was a substantial risk that the jury would have reached a different conclusion had the 'newly discovered' evidence been admitted at trial." *Commonwealth* v. *Jones*, 432 Mass. 623, 633 (2000). If it can be said to have impeachment value, it certainly does not warrant a new trial. "Newly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial." *Commonwealth* v. *Lo*, 428 Mass. 45, 53 (1998), quoting *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 (1993). The evidence was not even "newly discovered," as there has been no showing that it could not have been elicited during cross-examination of Dr. Profit at trial. See *Commonwealth* v. *Grace*, 397 Mass. 303, 306 (1986).

There was no error in the denial of the defendant's motion for a new trial.

8. *Relief under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the entire record, and decline to reduce the conviction or to order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*