**Joseph SLEEPER, Petitioner**

v.

**Luis S. SPENCER, Superintendent, M.C.I Norfolk and Thomas F. Reilly, Attorney General for the Commonwealth of Massachusetts, Respondents.**

**Civil Action No. 03–30061–MAP.**

United States District Court, D. Massachusetts.

Sept. 11, 2006.

Eva M. Badway, Attorney General's Office, Boston, MA, for Respondent.

William Newman, Lesser, Newman, Souweine & Nasser, Northampton, MA, for Petitioner.

*MEMORANDUM AND ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS* (Dkt. No. 1)

PONSOR, District Judge.

### I. *INTRODUCTION*

Petitioner Joseph Sleeper, a state prisoner serving a life term for first-degree murder, seeks habeas relief pursuant to 28 U.S.C. § 2254. He contends that his federal constitutional rights were violated in numerous ways, and sets forth six separate grounds for habeas relief.

For the reasons outlined below, the court will deny habeas relief.

### II. *FACTS AND PROCEDURAL BACKGROUND*

#### A. *The Crime.*

The underlying facts in this case are largely undisputed. On September 6, 1993, Petitioner killed his estranged wife Victoria by stabbing her at least eight times. He then turned himself in and confessed to the killing. *See Commonwealth v. Sleeper,* 435 Mass. 581, 760 N.E.2d 693, 698–700 (2002) (setting forth facts in detail).

#### B. *The Trial.*

##### 1. *Opening Arguments.*

Prior to trial, Petitioner's attorney gave written notice of his intent to present an insanity defense and filed a request for insanity instructions. (*See* Dkt. No. 13, Resp't's Supplemental App. Ex. C, at 12, 18–21.)

During opening arguments, defense counsel outlined the case as follows:

> What I must tell you now is not easy to say, but I'm going to tell you anyway[.] Joseph Sleeper killed his wife, he stabbed her at least eight times viciously in the chest and other parts to her body.
>
> So that part of this case is over[.] ... But that is not why you are here, it isn't anymore. [Y]ou're here to determine whether or not Joseph Sleeper committed first degree murder, second degree murder, manslaughter, *or was insane at the time he did it.*

(Dkt. No. 43, Pet'r's Mem. 11 (emphasis added).[1]) Trial counsel then told the jury

---

1. Excerpts of the relevant remarks are set forth in Petitioner's Memorandum (Dkt. No. 43) and Respondent's Supplemental Appendix (Dkt. No. 13). The parties have not, however,

that the judge would explain the elements of the possible verdicts:

I'm not going to sit there and tell you what they are. That's Judge Moriarty's job at the end of all the evidence, but that is what we're here to do, and that is what I'm going to ask you to listen to.

(*Id.* 11–12.). Counsel also told the jury that they would have to

make a determination as to whether this was a premeditated and planned scheme, a first degree murder case, which it is not; or something that built in this man and drove him crazy. That is what happened.

(*Id.*)

Trial counsel's opening remarks also highlighted the unpleasant nature of Petitioner's crime, describing it as vicious and emphasizing the fact that Sleeper "stabbed [his wife] over and over and over and over and over again." (*Id.* at 13.)

2. *Expert Witness Testimony.*

Two forensic psychologists testified as expert witnesses during the trial. Dr. Ronald S. Ebert gave evidence on behalf of Petitioner. He

opined that [Sleeper] was suffering from alcoholism, and an acute state of depression with psychotic features. He further opined that, although [Sleeper] did not lack criminal responsibility, he was overcome by a flood of emotion and his capacity to form the intent to kill was diminished at the time he stabbed [his wife]. On cross-examination, Dr. Ebert stated that [Sleeper] had the capacity to premeditate and to harbor malice up to

supplied complete transcripts of the various state court proceedings. (*Cf.* Dkt. No. 21, Pet'r's Mot. to Supplement Gov't's App. 2 (noting that Respondent offered to provide full transcripts and requesting that "at the appropriate time these transcripts be filed and made part of the record").)

the moment he began to hallucinate and stab his wife, but that such capacity was diminished.

*Sleeper,* 760 N.E.2d at 699–700.

Dr. Wesley Profit, then director of forensic services at Bridgewater State Hospital, testified on behalf of the Commonwealth.

He opined that the depression experienced by [Sleeper] at various times during his life was not clinically significant, and that at the time of the stabbing [Sleeper] was not suffering from any significant mental illness, that he did not lack criminal responsibility, and that the depression he was experiencing did not interfere with his ability to meet the ordinary demands of life or produce a psychotic break with reality. Dr. Profit did not form an opinion as to whether [Sleeper] suffered from a "diminished capacity" because he had not been asked to examine him for that purpose, but he did testify that in his opinion [Sleeper] had the capacity to deliberately premeditate and act with malice aforethought at the time of the killing.

*Id.* at 700.

3. *Testimony by Trooper Bruce Hiorns.*

During the trial, Hampden County Trooper Bruce Hiorns testified about the events that took place when Petitioner voluntarily turned himself into the police and confessed. Hiorns testified that although he had intended to take a written statement from Petitioner, he was unable to do so, because when the possibility was

Nothing in the parties' papers suggests that any portion of the record not currently before the court would change the outcome in this case.

raised, Petitioner invoked his right to counsel, saying, "Geez, maybe I should get a lawyer." The prosecutor then asked Hiorns, "After he said that, did you feel you could question him any longer?" to which Hiorns replied, "No, I did not." (Dkt. No. 43, Pet'r's Mem. 64.)

### 4. The Prosecutor's Closing Argument.

When making his closing argument, the prosecutor commented on the account of the crime that Petitioner had provided to the police. The prosecutor highlighted a number of details that Petitioner had failed to reveal during his confession. (See, e.g., Pet'r's Mem. 64 ("If that's the truth, don't you think that's what he would have told those police officers when he first walked into that station?").)

The prosecutor also attempted to cast doubt on the credibility of Petitioner's trial testimony.

> [C]onsider when you consider the defendant's credibility, what interest he has in this case, what interest does he have in giving you a version of facts which are favorable to him? He has attempted to tailor every piece of evidence in this case, to put a spin on it that will get you to believe that it's only a manslaughter case. Doesn't he have an interest in fooling you, ladies and gentlemen ... ?

(Resp't's Supplemental App. Ex. C., at 237–38.) The prosecutor emphasized this argument, repeatedly asserting that Petitioner had lied in his testimony. (See Pet'r's Mem. 40 n. 6.)

### 5. Trial Counsel's Closing Argument.

During his closing argument, trial counsel echoed portions of his opening statement, but omitted any reference to insanity. "I beg you to listen to the judge on ... whether or not this was murder in the first degree, murder in the second degree or manslaughter." (Id. at 14.) Counsel explained the role of the jury: "We are here to determine the degree of homicide." (Id.)

Counsel also discussed the testimony of the two expert witnesses. He noted that the defense expert had said Sleeper "was sane last week." (Id.) Counsel underscored the irrelevance of this testimony, pointing out that "[w]e are not talking about sanity versus insanity ...." (Id.) He made a similar comment about the finding by the Commonwealth's expert that Sleeper was sane.

> Again, we are not saying that he's not guilty, he was insane .... [The Commonwealth's expert] says he's not insane. Big deal, we told you that last week.

(Id. at 15.)

### 6. Juror Issues.

During voir dire, one juror reported to the court that a Commonwealth witness was a friend of the family and a personal friend. In response to questioning from the judge, the juror indicated that he could remain impartial. He was not excused or challenged.

On the second day of trial, a juror indicated that he wished to address the judge. Counsel offered no objection when the judge proposed that a hearing be conducted at sidebar. At sidebar, the juror indicated that she was having "a very hard time dealing with this," the trial was making her "physically sick," she could not sleep, and she could not focus on the trial and look at the photographs. The judge questioned the juror, invited counsel to ask questions, and then excused the juror without objection. Petitioner was not present during this process.

On the third day of trial, a juror was seen coming out of the elevator with the victim's relatives. The judge questioned

the juror, who indicated that the case had not been discussed in the elevator. There was no objection to the questioning.

### 7. *Jury Instructions.*

In charging the jury, the court gave a number of instructions to which Petitioner now objects.

First, in the manslaughter charge, the trial court stated:

[T]he Commonwealth has the burden of proving that the defendant did not act in the heat of passion on adequate provocation. The defendant does not have to prove that he did. . . .

(Pet'r's Mem. 57.)

The instruction on mental state included the following language:

Now, in determining whether a defendant in any criminal case was guilty of malice, the fact if it is a fact that he was suffering from some mental condition or had some mental condition is a fact that can be taken into consideration by the jury in determining whether he was capable of forming a specific intent or capable of having the actual knowledge that his action created the plain and strong likelihood that death would follow the contemplated act.

(*Id.* at 61.)

The reasonable doubt instruction stated:

[I]n a civil case one side or the other has the burden of proving facts by what is called a fair preponderance of the evidence. Which really means simply to prove that a given fact is more likely, more probable than not. That's the standard that exists in a civil case. But in a criminal case, and this is a criminal case, the burden that rests on the government is much greater than that. To simply prove in a criminal case that the defendant is more probably guilty than not is not nearly enough. In a criminal case, the facts must be proved beyond reasonable doubt, that means to a moral certainty. Anything less than that degree of conviction as to any fact or fact necessary to a conviction upon the particular charge would mean that the Commonwealth had not proved its case, and the defendant would be entitled to an acquittal.

Now, a word of caution, however: proof beyond reasonable doubt does not mean proof beyond all doubt or an imaginary doubt. A reasonable doubt, for example, is not the doubt that might exist in the mind of a man or woman searching for some doubt or some excuse to acquit a defendant. It does not mean that and it does not mean absolute proof or proof to mathematical certainty, if indeed there is such a thing as mathematical certainty, but it does mean such proof as fully convinces you as reasonable persons now, earnestly seeking the truth, that the defendant is guilty.

But if, after all is said and done, there remains in the minds of the jury any reasonable doubt as to the existence of any fact or fact necessary to a conviction upon the particular charge, then it becomes the duty of the jury to resolve that doubt in favor of the defendant and find him not guilty . . . . [T]he Commonwealth has, and it does have, the burden of proving each essential element of its case and proving it beyond any reasonable doubt . . . .

. . . . .

Now, if you are satisfied, ladies and gentlemen, beyond any reasonable doubt, that the defendant did specifically intend to kill his wife or to cause her grievous bodily injury, or that he acted with knowledge of facts creating a plain and clear likelihood that death would follow his intended action, but have a reasonable doubt as to whether the kill-

ing was committed in the heat of passion upon adequate provocation as I defined that, then you must resolve that doubt in favor of the defendant and find him guilty of manslaughter, voluntary manslaughter, and not of murder.

(Resp't's Supplemental App. Ex. C., at 279–80.)

### 8. *Conviction and Sentence.*

On June 1, 1994, after a four-day trial, Petitioner was convicted of murder in the first degree by reason of deliberate premeditation, and of violating an abuse prevention order. He was sentenced to life without parole.

### C. *Additional Information Concerning the Commonwealth's Expert Witness, Dr. Profit.*

After the trial, Petitioner became aware of additional information regarding the background of the Commonwealth's expert witness, Dr. Profit. Petitioner learned that Dr. Profit had been investigated in connection with allegations of sexual misconduct. During the investigation, which coincided with his trial testimony, Dr. Profit agreed not to see patients, but continued to serve as forensic supervisor at Bridgewater State Hospital and continued to supervise employees at that institution. The civil action against Dr. Profit eventually settled, and the Board of Registration of Psychologists closed its case without taking any action against the doctor.

Neither the prosecutor, nor any member of the prosecution team, was aware of the proceedings against Dr. Profit. As Dr. Profit later explained at an evidentiary hearing concerning Petitioner's motion for a new trial, he had deliberately kept the details of these proceedings a secret and had not informed the prosecutor of his situation.

Petitioner also contends that Dr. Profit exaggerated his credentials when he testified to having an appointment as an instructor of psychology in the Department of Psychiatry at the Harvard Medical School. Dr. Profit's position was, in fact, an unpaid, honorary appointment that involved no classroom instruction.

### D. *Direct Appeal and Motion for a New Trial.*

After his conviction, Sleeper moved for a new trial and appealed his conviction directly to the Supreme Judicial Court (SJC). On January 10, 2002, the SJC affirmed both Petitioner's conviction and the motion judge's denial of the motion for a new trial. *See Sleeper*, 435 Mass. 581, 760 N.E.2d 693.

A petition for rehearing was denied on February 27, 2002.

### III. *STANDARD OF REVIEW*

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a state prisoner is entitled to relief where a state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1); *see also Horton v. Allen*, 370 F.3d 75, 80 (1st Cir.2004), *cert. denied*, 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905.

A decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

A decision of the state court is an "unreasonable application" of the law if the state court "identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* An unreasonable application of the law is one that is not merely incorrect but also objectively unreasonable. *Id.* at 410–11, 120 S.Ct. 1495. Thus if "it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002).

"Federal habeas review of a state court's factual findings is similarly constrained." *Mastracchio v. Vose,* 274 F.3d 590, 597 (1st Cir.2001). State court factual findings control unless Petitioner can show that they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at 597–98 (quoting 28 U.S.C. § 2254(d)(2)). This statutory language

> must be interpreted in light of twin congressional directives that "a determination of a factual issue made by a State court shall be presumed to be correct," and that an applicant for a writ of habeas corpus "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

*Id.* at 598 (quoting 28 U.S.C. § 2254(e)(1)). Thus, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." *Id.*

Finally, where a state court has not considered the merits of a particular claim, AEDPA's narrow standard of review does not apply and the federal court will review the claim de *novo. See Norton v. Spencer,* 351 F.3d 1, 5 (1st Cir.2003), *cert. denied,* 542 U.S. 933, 124 S.Ct. 2876, 159 L.Ed.2d 798 (2004).

## IV. *PETITIONER'S CLAIMS FOR RELIEF*

As noted above, Petitioner sets forth six different grounds for habeas relief. Petitioner's first claim for relief, which alleges ineffective assistance of counsel, will be addressed last, both because it is Petitioner's most substantial argument and because it overlaps with several other claims.

### A. *Exculpatory Evidence.*

Petitioner argues that he was denied his constitutional right to exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the Commonwealth withheld potential impeachment evidence concerning Dr. Profit, the state's expert witness. According to Petitioner, Dr. Profit's testimony was particularly important because he was the only source of evidence on a number of critical issues, including mental state. Petitioner therefore contends that had the prosecution made the required disclosures, the defense would have been able to impeach Dr. Profit's testimony in at least three different ways.

First, Petitioner claims that the undisclosed evidence could have shown that Dr. Profit was biased or motivated to lie when he testified. Petitioner appears to believe that because Dr. Profit was under investigation by the Board of Registration of Psychologists and subject to a civil suit at the time of his testimony, he would have been motivated to testify favorably on the government's behalf in Sleeper's criminal trial.

Second, Petitioner argues that had the information about the alleged misconduct and honorary nature of the Harvard appointment been disclosed, trial counsel could have cast doubt on Dr. Profit's credibility by cross-examining the witness about the allegedly misleading presentation of his credentials.

Finally, Petitioner contends that trial counsel could have impeached Dr. Profit

by cross-examining him on the substance of the allegations of misconduct.

### 1. *De Novo Review.*

■ Petitioner argues that he is entitled to *de novo* review on his *Brady* claim because the SJC did not reach the merits of his claim.

Petitioner contends that the SJC failed to directly address Dr. Profit's motive to lie when he testified. In fact, the state court addressed precisely this issue. First, it noted that Petitioner had failed to demonstrate that Dr. Profit was concerned about a *criminal* prosecution. Moreover, to the extent that the civil suit provided a motive to distort his testimony, the court found that "Dr. Profit's trial testimony was consistent with his written report, which predated the civil action." *Sleeper,* 760 N.E.2d at 713. Thus "the evidence did not tend, even remotely, to suggest bias." *Id.* at 712. Further, because the prosecutor was not aware of the pending investigation before the Board,

> Dr. Profit logically could not have thought that favorable testimony for the Commonwealth at the defendant's trial might help him with the [B]oard. Thus, there was no nexus between any possible bias the witness might have toward this prosecutor's office and what was pending before the [B]oard.

*Id.*

As the SJC clearly considered the merits of Petitioner's *Brady* claim, *de novo* review is not appropriate.

### 2. *AEDPA Review.*

Petitioner argues in the alternative that the SJC's decision involved an unreasonable application of or was contrary to clearly established federal law.

A *Brady* claim has three elements. First, the relevant evidence "must be fa-vorable to the accused, either because it is exculpatory or because it is impeaching." *Healy,* 453 F.3d 21, 25 (1st Cir.2006) (citation and quotation omitted). Second, the evidence must have been suppressed by the state, either willfully or inadvertently. *Id.* (citation and quotation omitted). Third, "prejudice must have ensued." *Id.* (citation and quotation omitted); *see also Brady,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

■ In this case, the key issue is whether Petitioner can show that any evidence was suppressed by the state. As noted above, Petitioner concedes that neither the prosecutor, nor any other member of the prosecution team, was actually aware of the proceedings against Dr. Profit. However, Petitioner contends that the prosecutor's "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" reaches Dr. Profit. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (explaining that such duty extends to evidence known to the police); *see also Mastracchio,* 274 F.3d at 600 (duty extends to individuals who help prepare the case, including assistant prosecutor or police investigators).

Petitioner contends the Dr. Profit was an investigator and therefore a member of the prosecution team. Dr. Profit worked regularly with the Commonwealth, completing numerous forensic examinations and testifying at trials. According to Petitioner, this extensive connection shows that Dr. Profit was a member of the prosecution team, and not merely a private vendor. Petitioner also argues that excluding Dr. Profit from the reach of the prosecutorial duty to disclose exculpatory evidence could render most of *Brady* a nullity, because it would allow the state to ignore *Brady* requirements by subcontracting criminal investigations.

However, Petitioner relies on cases that focus explicitly on police investigators or assistant prosecutors. Petitioner cites no well-established law to show that a private vendor, no matter how much business he conducts with the state, is a member of the prosecution team to whom a duty to disclose extends. Thus, this court cannot find that the SJC was unreasonable when it affirmed the lower court's ruling that the prosecutor had not violated the duty to disclose.[2]

Petitioner also contends that the SJC ruling was contrary to *Lindh v. Murphy*, 124 F.3d 899 (7th Cir.1997), *cert. denied*, 522 U.S. 1069, 118 S.Ct. 739, 139 L.Ed.2d 676 (1998). Petitioner claims that the cases are indistinguishable, noting that in both a key psychiatric witness burnished his credentials and had a reason to slant his testimony. However, the Seventh Circuit's conclusion in *Lindh* that a petitioner's confrontation clause rights had been violated did not turn on the psychiatric witness' motive to lie. *See id.* at 901 ("[T]he difficulty of establishing that [the witness] shaded his testimony would make this case a candidate for a conclusion that any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)—*but for the rosy glow in which the prosecutor bathed [the witness]*." (emphasis added) (citation omitted)). Instead, the Court of Appeals focused on the fact that the prosecutor, knowing in advance that the trial judge had ruled to exclude certain impeachment evidence, presented a key psychiatric witness as a "scientist of impeccable credentials and high moral standards—an unimpeachable man." *Id.* at 901. In comparing Petitioner's case with *Lindh*, the SJC correctly noted,

> Here, the prosecutor did not mislead the jury as to Dr. Profit's personal and professional credentials and thereby take unfair advantage of an advance evidentiary ruling preventing impeachment. There was no such ruling and the prosecutor was unaware of the impeachment evidence.

*Sleeper*, 760 N.E.2d at 713. Thus *Lindh* is clearly distinguishable, and the SJC's opinion is not contrary to well-established federal law.

**B.** *The Prosecutor's Closing Argument.*

Petitioner contends that his constitutional rights were violated when the prosecutor argued in his closing that Petitioner

---

**2.** Although Petitioner focuses on the question of whether Dr. Profit was a member of the prosecution team, the SJC also discussed other elements of Petitioner's *Brady* claim. The state court concluded that the motion judge had not abused his discretion when he ruled that the potential impeachment evidence would have been inadmissible. 760 N.E.2d at 713. In addition, the state court found that the motion judge was not clearly erroneous when he concluded that even if the impeachment evidence was admissible, it would not have affected the jury's verdict because the cross-examination of Dr. Ebert, Petitioner's expert witness was the testimony that had done "most of the damage" to the defense. *Id.*

Finally, the SJC found that with respect to the question of Dr. Profit's credentials, Peti-

tioner had not satisfied his burden to show that "there was a substantial risk that the jury would have reached a different conclusion" had the evidence been admitted. *Id.; see also Commonwealth v. Tucceri*, 412 Mass. 401, 589 N.E.2d 1216, 1223 n. 11 (1992) (explaining that substantial chance standard is more generous to defendants than federal standard); *McCambridge v. Hall*, 303 F.3d 24, 35 (1st Cir.2002) (noting that where state court applies state standard more favorable to defendants than federal standard, federal law adjudication is presumed to be subsumed within state law adjudication).

Petitioner has not shown that the state court's ruling on these issues was either an unreasonable application of or contrary to well-established federal law.

lacked credibility. Petitioner claims that this argument violated two "established tenets" of constitutional law, namely that an indictment constitutes no evidence of guilt, and that a prosecutor may not strike foul blows in his closing argument.

### 1. *Petitioner's Interest in the Case.*

Petitioner argues that it was improper for the prosecutor to ask the jury to consider Sleeper's interest in his own case when evaluating his credibility as a witness, because this undermined the presumption of innocence. Petitioner contends that the prosecutor's statements about Petitioner's "interest . . . in his case" and "interest in fooling [the jury]" unduly burdened his right to testify and present evidence in his own behalf.

### a. *De Novo Review.*

■ Petitioner contends that he is entitled to *de novo* review because the SJC "did not reasonably address a primary contention—the use of the indictment for impeachment purposes." (Pet'r's Mem. 41.) Although *de novo* review is appropriate where the state court has not addressed the merits of a particular claim, a petitioner is not entitled to *de novo* review where he believes that a state court acted unreasonably. The reasonableness of the state court's decision is of course evaluated under the standard AEDPA framework.

To the extent that Petitioner means to suggest that the SJC did not address the merits of this particular argument because it failed to address the prosecutor's use of the *indictment* to impeach Petitioner, this argument also fails. First, Petitioner makes no showing that the prosecutor actually referred directly to the indictment when making his comments. Second, as Petitioner himself concedes, "the difference between being a defendant and being a person who has been indicted" is "a

distinction that as a practical matter is meaningless." (Pet'r's Mem. 41.)

The state court directly addressed Petitioner's claim that "the prosecutor improperly asked the jury to consider the defendant's interest in the case when assessing his credibility." *Sleeper,* 760 N.E.2d at 705. Thus *de novo* review is not warranted.

### b. *AEDPA Review.*

Petitioner also contends that the state court's decision regarding the prosecutor's comments was both unreasonable and contrary to clearly established law. According to Petitioner, well-established law holds that a defendant who takes the stand must not be subject to an argument that he is lying simply because he is the defendant and therefore inevitably has an interest in the case.

Petitioner relies, however, on a number of cases that fail to directly support this specific proposition. For example, Petitioner cites *Taylor v. Kentucky,* 436 U.S. 478, 487, 490, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), where the Court found that when a prosecutor's closing statement "could be viewed as an invitation to the jury to consider petitioner's status as a defendant as evidence tending to prove his guilt," a judge's failure to instruct on the presumption of innocence amounted to a constitutional violation. In Petitioner's case, the judge did give an instruction on the presumption of innocence.

Other cited cases also fail to offer direct support for Petitioner's broad reading of the law. *See e.g., Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (explaining that a state may not use "evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential ele-

ment of a crime"); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (explaining presumption of innocence in general terms and finding that it has no bearing on the rights of pretrial detainees).

■ Although Petitioner is correct that the presumption of innocence protects an indicted defendant from assumptions about his guilt, it is clear that "when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." *Portuondo v. Agard,* 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) (quotation omitted). Thus despite Petitioner's insistence to the contrary, under well-established federal law a prosecutor may in fact cast doubt on a testifying defendant's credibility.

■ Moreover, even if Petitioner could establish that in this case the prosecutor's comments about credibility went beyond the allowable limits for impeachment, Petitioner would have to make a further showing. In such a case, the "relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). When determining "whether prosecutorial misconduct has so poisoned the well that a new trial is required," the First Circuit weighs several factors:

> (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.

*U.S. v. Rodriguez–De Jesus,* 202 F.3d 482, 485 (1st Cir.2000).

■ The state court's analysis fits comfortably within this legal framework. The SJC quickly disposed of Petitioner's arguments: "Contrary to [Sleeper's] assertion, the prosecutor did not suggest that [Sleeper] should be disbelieved simply because he had been indicted." 760 N.E.2d at 705. Rather, the state court found that the prosecutor had spent a "substantial portion" of his closing argument reviewing inconsistencies in the evidence. *Id.* Thus the argument about Petitioner's credibility was "anchored to the evidence," "entirely appropriate," and an element of the cross-examination to which Petitioner exposed himself by testifying. *Id.* (citing *Jenkins v. Anderson,* 447 U.S. 231, 236, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), and *Portuondo v. Agard,* 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000)). The state court's ruling was neither unreasonable nor contrary to clearly established federal law.

2. *"Foul Blows" Claim.*

■ Petitioner also contends that the prosecutor unconstitutionally struck "foul blows" in his closing statement by referring to Petitioner's alleged lies. The SJC found that Petitioner had forfeited this claim by making no contemporaneous objection and failing to raise the issue in his motion for a new trial.

■ When a state court reaches its decision on an independent and adequate state law ground, habeas review is precluded. *Horton,* 370 F.3d at 80. The decision to find a forfeiture is an independent and adequate ground for a state court's decision so long as the state court consistently applies the rule and has not waived it in this case. *Id.* at 80–81. "The SJC consistently enforces the rule that unpreserved claims are forfeited" and did so in this case. *Id.* at 81 (citations omitted). Furthermore, while the SJC reviewed Petitioner's claim "to determine whether any

error created a substantial likelihood of a miscarriage of justice," *Sleeper,* 760 N.E.2d at 704, "this sort of limited review does not work a waiver of the contemporaneous objection requirement," *Horton,* 370 F.3d at 81.

Petitioner may preserve a forfeited claim for federal review if he establishes "cause and prejudice" with respect to the procedural default. *Horton,* 370 F.3d at 81. To show cause, Petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* (citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

Petitioner has not attempted to make any such showing. At oral argument, however, Petitioner suggested that all procedurally defaulted claims could be preserved as claims for ineffective assistance of counsel. *See id.* ("One way to establish cause is to demonstrate that defense counsel's inaction constituted ineffective assistance of counsel.").

Petitioner's ineffective assistance of counsel claims will be addressed below.

## C. *Jury Issues.*

### 1. *Juror Discharge.*

■ Petitioner contends that he was denied due process and confrontation rights when a sitting juror was questioned and discharged outside his presence.[3] Petitioner argues that the SJC's analysis of this issue was contrary to and an unreasonable application of well-established federal law.

The failure to include Petitioner in the juror discussion was clearly error under

state law. *See Sleeper,* 760 N.E.2d at 701. However, the scope of Petitioner's federal constitutional rights is somewhat less clear. Under the Fifth and Sixth Amendments, a defendant is guaranteed the right to be present at every stage of his trial. *See, e.g., U.S. v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) (Fifth Amendment); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Sixth Amendment). This fundamental right reaches all proceedings "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . ." *Gagnon,* 470 U.S. at 526, 105 S.Ct. 1482 (citing *Snyder v. Mass.,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

However, Petitioner cites no authority suggesting that a defendant has an absolute right to be present at all conversations with jurors, and the Supreme Court has found constitutional violations only in some situations. For example, although the Court has described *voir dire* as a *"critical stage* of the criminal proceeding, during which the defendant has a constitutional right to be present," *Gomez v. U.S.,* 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (emphasis added), it has also found no violation where a trial judge conducts an *in camera* conversation with a juror in the presence of defendant's counsel, *Gagnon,* 470 U.S. at 526, 105 S.Ct. 1482 ("[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." (quoting *Rushen v. Spain,* 464 U.S. 114, 125, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring in the judgment))).

*Sleeper,* 760 N.E.2d at 701 (citing *Commonwealth v. Hallet,* 427 Mass. 552, 694 N.E.2d 845, 846–47 (1998)).

---

**3.** Although there was no contemporaneous objection to the discharge, the motion judge considered the merits of the issue, thereby resurrecting it for full review on the merits.

Because federal law does not dictate a clear outcome in this case, the SJC's decision cannot be either objectively unreasonable or contrary to well-established law. As noted above, the state court concluded that it was error to "conduct[ ] an inquiry into a consequential matter involving allegations that call into question the impartiality of a trial juror" when Petitioner was not present. *Sleeper*, 760 N.E.2d at 701 (citing *Commonwealth v. Martino*, 412 Mass. 267, 588 N.E.2d 651, 662–63 (1992)). However, the court also observed that there was no suggestion that the judge's decision to discharge the juror was unsupported by the record, or otherwise an abuse of discretion. Thus, the state court concluded that the error in proceeding without Petitioner was harmless beyond a reasonable doubt, because Petitioner's "presence at the hearing would not likely have yielded anything or altered its outcome." *Id.; cf. Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (articulating harmless error standard for habeas cases).

### 2. *Juror Impartiality.*

Petitioner contends that his rights were violated when the judge failed to make a "significant inquiry" into juror impartiality on two different occasions. First, Petitioner objects to the fact that a juror who admitted that he knew a Commonwealth witness was questioned only briefly during *voir dire*. Second, Petitioner objects to the summary inquiry into possible undue influence after a juror was seen leaving the elevator with the victim's relatives.

The SJC found that Petitioner had forfeited these claims by failing to challenge the first juror or object to the questioning of the second juror. *See Sleeper*, 760

N.E.2d at 700. As noted above, when a state court reaches its decision on an independent adequate state law ground such as procedural forfeit, habeas review is precluded unless a petitioner establishes "cause and prejudice" with respect to the default. Petitioner has not attempted to make any such showing in his papers, although he suggested at oral argument that all procedurally defaulted claims could be preserved as claims for ineffective assistance of counsel. *Strickland* claims will be addressed below.

### D. *Jury Instructions.*

#### 1. *The Burden of Proof and Mental State Instructions.*

Petitioner argues that his fundamental constitutional rights were violated when the court gave a jury instruction that shifted the burden of persuasion on an element of the offense of manslaughter. Petitioner also contends that the instruction on mental state was incorrect because it focused on Petitioner's capacity to form the specific intent to kill and not on whether he actually formed such a specific intent.

These claims are both procedurally defaulted. *See Sleeper*, 760 N.E.2d at 706. As noted above, at oral argument Petitioner attempted to revive all procedurally defaulted claims as claims for ineffective assistance of counsel. These arguments will be addressed below.

#### 2. *The Reasonable Doubt Instruction.*

Petitioner also contends that the reasonable doubt jury instruction was improper and denied him fundamental constitutional rights.[4] First, he contends that the "moral certainty" instruction was not clearly linked to the burden-enhancing language.

---

**4.** This is another issue that the motion judge resurrected for full review on the merits. *Sleeper*, 760 N.E.2d at 708 (citing *Common-*

*wealth v. Hallet,* 427 Mass. 552, 694 N.E.2d 845, 846–47 (1998)).

Moreover, Petitioner argues that this error was compounded by the court's instruction about a "reasonable person seeking" the truth, which impermissibly applied a preponderance standard to the evidence. Second, Petitioner objects to the fact that the charge used the word "satisfied" repeatedly with regard to the burden of proof. Petitioner contends that the use of the phrases "if you find" and "if you are satisfied" violates the federal constitutional guarantee because the words can lead to burden shifting.

Petitioner concedes that the First Circuit reviewed a similar reasonable doubt instruction in *Watkins v. Murphy*, 292 F.3d 70, 77 (1st Cir.2002), and affirmed the district court's denial of habeas relief. Petitioner contends that his case is distinguishable, because the problematic reasonable doubt instruction was combined with an erroneous mental state instruction.[5] As noted above, the state court found that Petitioner's claim regarding the mental state instruction was procedurally defaulted. Petitioner cannot now revive the mental state claim simply by weaving it into his reasonable doubt argument.

Because Petitioner's reasonable doubt argument relies entirely on his defaulted mental state claim, it is unpersuasive. Petitioner is not entitled to habeas relief on this ground.

### E. *Doyle Claims.*

Petitioner contends that he is entitled to habeas relief because his rights under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), were violated twice. According to Petitioner, the first violation occurred when the prosecutor elicited the trooper's testimony about the fact that police questioning ended abruptly because Petitioner invoked his right to counsel. Petitioner contends that a second *Doyle* violation occurred when the prosecutor asked the jury to draw adverse inferences from Petitioner's silence, that is, when the prosecutor in his closing drew attention to details about the crime that Petitioner had not spontaneously revealed to the police. Petitioner claims that had he not terminated questioning by invoking his right to counsel, the police might have elicited the relevant details; thus, he contends, the prosecutor's argument amounted to an adverse comment on Petitioner's invocation of the right to counsel.

The SJC determined that Petitioner forfeited this claim through his failure to offer a contemporaneous objection.[6] As

---

**5.** Petitioner also asserts that this case is distinguishable because any problem with the reasonable doubt instruction is exacerbated by the prosecutor's argument suggesting that the Petitioner's interest in the case affects his credibility. Petitioner fails, however, to develop this argument further. Moreover, as noted above, Petitioner is not entitled to habeas relief based on the prosecutor's allusions to his credibility.

**6.** In his reply memorandum, Petitioner argues that the SJC erred when it said that the *Doyle* argument was not preserved. Petitioner contends that when the prosecutor asked the question that elicited testimony about Petitioner's invocation of the right to counsel—the subject of Petitioner's first *Doyle* claim—

trial counsel did in fact object. (Dkt. No. 46, Pet'r's Reply Mem. 10 (citing trial transcript).) Petitioner therefore contends that his *Doyle* claim was preserved and should be reviewed by this court under the customary habeas standard.

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of federal constitutional claims." *Burks v. Dubois*, 55 F.3d 712, 715 (1st Cir.1995). This court does not sit in review of the state court's forfeiture ruling.

Petitioner may, of course, preserve this *Doyle* claim by showing "cause and preju-

noted above, Petitioner has attempted to preserve defaulted grounds for relief as claims for ineffective assistance of counsel, which will be considered below.

### F. *Ineffective Assistance of Counsel.*

Petitioner argues that he was denied the effective assistance of counsel when his trial attorney promised in his opening to present an insanity defense, even though he knew or should have known that no evidence supporting such a defense would be forthcoming.

#### 1. *De Novo Review.*

Petitioner argues that the court should review his ineffective assistance claim *de novo*, because the SJC ignored the relevant facts and never applied the *Strickland* standard. *See Norton*, 351 F.3d at 5.

Petitioner's argument is without merit. The SJC did not ignore the relevant facts, but in fact quoted several instances in which trial counsel alluded to Petitioner's insanity.[7] The court then applied the state law standard for ineffective assistance of counsel to Petitioner's claims. This state standard, set forth in *Commonwealth v. Wright*, 411 Mass. 678, 584 N.E.2d 621 (1992), "is at least as generous to the defendant as the federal ineffective assistance of counsel standard." *Horton*, 370 F.3d at 86. Thus although the SJC never

cited *Strickland*, the court applied the correct legal standard when it analyzed Petitioner's claims under *Wright*. *See id.*

#### 2. *AEDPA Review.*

Petitioner argues in the alternative that the SJC unreasonably applied the governing legal standard. The governing legal standard is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Williams v. Taylor*, 529 U.S. 362, 391–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (*Strickland* is clearly-established federal law that governs habeas claims related to ineffective assistance of counsel). Under *Strickland*, Petitioner must establish two elements in order to prevail on a claim of ineffective assistance of counsel.

> First, [he] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, [Petitioner] must show that the deficient performance prejudiced the defense.

*Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir.2002) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). With respect to the first element, "[j]udicial scrutiny of counsel's performance must be highly deferen-

dice" with respect to the procedural default. *Horton*, 370 F.3d at 81. The claim can also be resurrected if Petitioner shows "a fundamental miscarriage of justice, i.e., 'a constitutional violation that has probably resulted in the conviction of one who is actually innocent.'" *Id.* at 81 n. 3 (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

7. Petitioner unfortunately misquotes the SJC's opinion in his memorandum, adding misleading emphasis to the court's opinion. According to Petitioner, the SJC stated: "*the* reference [*singular—sic*] to insanity 'was never meant to suggest the promise of an insanity

defense.'" (Pet'r's Mem. 17 (alterations and emphasis in original).) In fact, after citing at least four allusions to insanity, the SJC concluded that "*any* reference to insanity in his opening was never meant to suggest the promise of an insanity defense." *Sleeper*, 760 N.E.2d at 711 (emphasis added).

Petitioner also claims that the court's opinion "ignores ... [trial counsel's] prediction about the judge's instructions." (Pet'r's Mem. 18.) In fact, the SJC directly quoted the relevant language from trial counsel's opening statement. *See Sleeper*, 760 N.E.2d at 711.

tial," *id.* (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052), and "leave ample room for variations in professional judgment," *id.* In addition,

> a reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented.

*Id.* (citing *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). Thus "[o]nly if, 'in light of all the circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance,'" can a court make a finding of ineffective assistance. *Id.* (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

Moreover, under the second element of the *Strickland* test, "even if a lawyer's performance is constitutionally unacceptable," *id.,* Petitioner is only entitled to relief if he demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). This level of prejudice is the exception and not the rule. *Id.* Nonetheless, while "the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent." *Id.* at 26 (citing *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052).

Petitioner contends that it is well-established law under *Strickland* that unfulfilled defense promises that might have affected the jury's determination constitute ineffective assistance of counsel. According to Petitioner, trial counsel's dramatic and reckless promise of an insanity defense in his opening statement contaminated the entire defense and destroyed counsel's credibility.[8] Petitioner notes that the distinctions between first degree murder, second degree murder, and manslaughter are narrow, and argues that but for trial counsel's deficient performance, his trial might have ended quite differently.

Petitioner's claim rests primarily on three decisions in which the First Circuit found prejudice where trial counsel failed to present promised testimony: *Anderson,* 858 F.2d 16; *U.S. v. Gonzalez–Maldonado,* 115 F.3d 9 (1st Cir.1997); and *Ouber,* 293 F.3d 19. *See Ouber,* 293 F.3d at 26 (noting that opinions of the inferior federal courts are relevant in assessing the reasonableness of a state court's treatment of a contested issue).

In *Anderson,* trial counsel explicitly promised that a psychiatrist and psychologist would testify as to the defendant's mental state. The Court of Appeals concluded that the subsequent failure to produce such witnesses was prejudicial as a matter of law, because, under the circumstances, the jurors would draw the harmful

---

**8.** Embedded in Petitioner's *Strickland* argument is a second basis for an ineffective assistance claim, namely that trial counsel effectively conceded Petitioner's guilt to a charge of first degree murder by reason of atrocity or cruelty. As Petitioner notes, in his opening, trial counsel emphasized the "vicious" nature of the crime, highlighting the fact that Petitioner stabbed his wife "over and over and over and over and over again."

However, Petitioner does not develop this claim, either by pointing to support in the factual record or relevant caselaw. Courts

have found that where a trial counsel openly concedes guilt over a defendant's objections, such actions may amount to a constitutionally deficient performance. *See, e.g., U.S. v. Holman,* 314 F.3d 837, 839–44 (7th Cir.2002) (holding that counsel's concession of guilt without client consent is deficient performance under *Strickland), cert. denied,* 538 U.S. 1058, 123 S.Ct. 2238, 155 L.Ed.2d 1108 (2003). In this case, trial counsel's alleged concession was vague at best, and there is no evidence to suggest that he made any such statements over Petitioner's objections.

inference "that the doctors were unwilling, viz., unable, to live up to their billing." *Anderson,* 858 F.2d at 17–19. Petitioner argues that in his case, after trial counsel's initial promise of an insanity defense, Dr. Ebert, the defense expert witness, as well as counsel, Petitioner, and the judge, all failed to "live up to their billing."

In *Gonzalez–Maldonado,* trial counsel, relying on an evidentiary ruling by the court, told the jury in his opening statement that he would be presenting testimony showing that a government witness was prone to exaggeration. The court subsequently reconsidered its earlier evidentiary decision and disallowed the relevant evidence. On appeal, the First Circuit concluded that when

> the defense fails to produce promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume that the expert is unwilling to testify and the defense is flawed.... As we did in *Anderson,* we find that promising to admit this important evidence and then failing to produce it is prejudicial as a matter of law in the circumstances of this case.

115 F.3d at 15. Petitioner argues that in his case trial counsel made an even more significant promise when he promised that the judge would instruct on insanity. Petitioner contends, moreover, that defense counsel made such a promise recklessly, as he knew or should have known that both the defense and Commonwealth experts would disavow any such defense.

Finally, Petitioner relies on *Ouber,* 293 F.3d 19, a case in which the Court of Appeals concluded that trial counsel was ineffective when he failed to call the defendant as a witness after having informed the jury four times in his opening that the defendant would testify. The court concluded that counsel's decision to place the defendant's testimony at the centerpiece of his defense, when combined with his subsequent decision to advise his client against testifying, constituted error under *Strickland. Id.* at 27. The court also found that a "broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made." *Id.* at 28.

Petitioner contends that in his case, as in *Ouber,* there was no strategic reason for counsel to promise evidence and then fail to produce it.

Petitioner concludes that these cases state a well-established rule of law under *Strickland* that unfulfilled defense promises that may have affected the jury's determination constitute ineffective assistance of counsel. Regardless of whether it is appropriate to draw any such general rule from these cases, it is clear that at the heart of each case is a set of facts that is not present in Petitioner's claim. In *Anderson, Gonzalez–Maldonado,* and *Ouber,* trial counsel promised that a certain individual would provide certain testimony that was central to the defense case, and then, for one reason or another, counsel failed to provide such testimony. In Petitioner's case, however, the defense made no such specific promise, either as to the appearance of a particular witness or as to the content of the witness's testimony. Instead, trial counsel made dramatic statements about the nature of the crime and suggested that an insanity defense and insanity instructions would be forthcoming.

 Nonetheless, Petitioner's argument undeniably has some strength. Trial counsel's statements are troubling. Whatever strategic reasons he may have had for vividly describing the distressing nature of the crime, the record appears clear that as to the issue of insanity, counsel knew or should have known that there would be no relevant evidence or instructions. To this

extent counsel appears to have made a serious mistake of some magnitude.

The critical question is whether counsel's mistake amounts to a constitutionally deficient performance. Under *Strickland,* courts are cautioned to take a highly deferential view of counsel's actions, and to avoid the distorting effects of hindsight. *See Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). This deferential standard suggests that even a lapse of professionalism such as that manifested in trial counsel's opening statement might not amount to a constitutionally deficient performance. For example, in analyzing trial counsel's performance in *Ouber,* the First Circuit concluded that counsel had committed two errors: first, he had made the initial decision to make the defendant's testimony the centerpiece of his case, and second, he had advised the defendant against testifying. *Ouber,* 293 F.3d at 27. The court noted that "[t]aken alone, each of these decisions may have fallen within the broad universe of acceptable professional judgments. Taken together, however, they are indefensible." *Id.*

The question of whether trial counsel's mistake in this case amounts to more than a lapse of professionalism is a close one. The court need not ultimately decide this issue, however, because for the purposes of habeas review, the key question is whether the state court made a *reasonable* decision under the governing law.

The SJC's analysis focused on the distinction between Petitioner's case and *Anderson,* 858 F.2d 16. The court concluded that, unlike in *Anderson,* trial counsel had not broken any promise to the jury. Rather, trial counsel described Sleeper as being insane or crazy when he acted, and two forensic psychologists then testified to Sleeper's depression. Thus the SJC found that "counsel's opening statement was reasonably predictive of the trial that unfolded," as the trial included "considerable testimony about [Sleeper's] mental state, including the testimony of two forensic psychologists." *Id.*

The state court also noted that defense counsel questioned both psychologists at trial, and that these were "controlled, appropriate examinations of the subject of the defendant's mental condition and how it affected his ability to form the requisite intent to commit murder . . . with no suggestion of insanity." *Id.* The court observed that counsel's "preparedness and consistency in strategy" showed that his opening was not a promise of an insanity defense, but a signal that mental state would be a central issue in the trial. *Id.*

The SJC therefore found that trial counsel merely misspoke and used an "unfortunate colloquialism" when he stated that the jury would be asked to determine whether Sleeper "was insane" and suggested that the judge would give an insanity instruction. *Id.* Based on this, the court concluded that this misstatement did reach the level of a broken promise.

"It is a daunting task for a habeas petitioner to show that a considered opinion by the state's highest court is objectively unreasonable when that court has made an evaluative judgment, based on the entire record and applying the correct legal standard, that the petitioner has not met" the relevant legal standard. *Healy,* 453 F.3d at 27. Moreover, "[i]t also bears note that the SJC was affirming, not reversing, the finding of the motion judge, who also applied the correct standard, that no new trial was warranted." *Id.* Under these circumstances, even conceding that counsel's tactical decision may have been questionable, the court cannot conclude that the SJC's analysis was objectively unreasonable.

### 3. *The Procedurally Defaulted Claims.*

As noted above, the state court found that several of Petitioner's grounds for relief were procedurally defaulted, either in whole or in part. A petitioner may preserve such claims for federal review if he shows "cause and prejudice" with respect to the procedural default. *Horton,* 370 F.3d at 81. To show cause, a petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* (citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

 Petitioner did not attempt to show "cause and prejudice" in either his initial memorandum or his reply. At oral argument, however, he suggested that all procedurally defaulted claims could be preserved as claims for ineffective assistance of counsel. A petitioner may indeed establish "cause" by demonstrating "that defense counsel's inaction constituted ineffective assistance of counsel." *Id.* In this case, however, Petitioner has not advanced the analysis by applying the *Strickland* standard to his defaulted claims. To allow Petitioner to resurrect defaulted claims by merely asserting generally that the claims survive under this alternate theory would effectively eviscerate the rule that forfeiture constitutes an independent and adequate ground for a state court's decision and precludes habeas review. The court will not proceed with a *Strickland* analysis of the defaulted claims when Petitioner himself has effectively declined to do so.

### V. *CONCLUSION*

For the reasons set forth above, the petition for habeas corpus (Dkt. No. 1) is hereby DENIED. The clerk will enter judgment for Respondents. This case may now be closed.

It is So Ordered.